FRED BRYSON ET UX *v.* DELMAR DILLON ET UX

5-4523                                                              427 S. W. 2d 3

Opinion delivered April 29, 1968

*Rhine & Rhine,* for appellants.

*Branch & Adair,* for appellees.

CARLETON HARRIS, Chief Justice. This is a boundary line case involving Lots 29 and 30 of Block "H-G" of Castleberry's Addition to Paragould, Arkansas. Appellants, Fred Bryson and wife, are the owners of Lot 30, and appellees, Delmar Dillon and wife, are the owners of Lot 29. The dispute which has arisen relates to the boundary line running east and west between the two lots. Both appellants and appellees derived their title either directly, or indirectly through mesne conveyances, from a common grantor, Kermit Mellberg. On April 7, 1949, Mellberg conveyed Lot 29 to W. W. Duncan and wife.[1] On January 14, 1956, Duncan and wife conveyed to Marion H. Wineland and wife. The Winelands conveyed the property to John D. Osburn on September 17, 1959, and the Osburns conveyed to appellees Dillon on September 27, 1965. The original deed from Mellberg to Duncan described the land conveyed as follows:

"The South Half of Lot 28 and all of Lot 29 in Block 'H-G' of Castleberry's Addition to Paragould, Arkansas, being a resurvey of Block 'H and G' of Castleberry's Addition to Paragould, Arkansas, as recorded in Plat Book 1, at page 45, said re-survey being of record in Plat Book 1, page 94."

In all of the other conveyances this same identical description was used. Appellant purchased Lots 30 and 31 in Block H-G from Mellberg and wife by warranty deed on December 3, 1962.

On May 31, 1967, appellees instituted suit against

---

[1]Actually, this conveyance was from Hilltop Lumber Company, Mellberg being a partner.

the Brysons alleging that in 1956 Wineland and Mellberg orally agreed that the boundary line between Lot 29 and Lot 30 "should be a line running East and West and located at a point five (5) feet South of the Southern most part of the house located on Lot 29, then owned by Marion H. Wineland, et ux, and now owned by the plaintiffs." It was then asserted that the subsequent grantees of Wineland had made improvements treating the aforesaid line as the true boundary and had exercised acts of ownership up to said line. It was then alleged that the Brysons were encroaching over the agreed line, and it was prayed that appellants be enjoined from interfering with the use of the property, and that appellants be required to remove rose bushes and other obstructions from the land allegedly belonging to appellees. The Brysons answered, denying that any oral agreement had ever been entered into concerning the boundary, asserting the title to the property in question, and asking that the complaint be dismissed. On trial, the court held that Wineland and Mellberg "had made a tacit agreement during 1956 as to the location of the boundary line" between the two lots, and that the Brysons and their predecessor in title had "acquiesced in the location of the boundary and are now estopped from asserting any other line as the boundary line" between Lots 29 and 30. Thereupon, the court declared the following line to be the boundary:

"The place of beginning shall be a point four feet South of the Southeast corner of the Southernmost wall of the plaintiffs' house. From the place of beginning run thence in an Easterly direction to the center of a drain pipe exit place (said drain pipe being the one running in a Southerly direction from the Southeast corner of the plaintiffs' house, approximately five feet; thence in an Easterly direction to its exit place); thence from said center of the exit place of the aforedescribed drain pipe and continuing in the same direction on the same course, to the East boundary line of Block 'H-G' of Castleberry's Addition to the City of Paragould, Arkansas.

"Then, again beginning at the place of beginning and running in a Westerly direction to a point twelve inches South of the South edge of the plaintiffs' water meter; thence continuing in the same direction and on the same course to the East line of Hilltop Street in Castleberry's Addition to the City of Paragould, Arkansas."

From the decree so entered, the Brysons bring this appeal.

First, let it be said that the evidence is undisputed that the record title to the property in question is in appellants.

Mr. Mellberg did not testify, and the court's finding was apparently largely based upon the testimony of Wineland. This witness testified that he and Mellberg lived next to each other, and that he (Wineland) performed drain work on the property while he lived at that location. He said that he hooked up a sewer line from his kitchen sink and from the automatic washer. "It run outside the kitchen window and then down to an open ditch at the back. It went out to the south and then east. About 4 or 5 feet outside the house." This "4 or 5 feet" was on the property presently owned by the Brysons, and Wineland said that he built a fence on the south side of the drain.[2] The witness said that

---

[2]From the testimony:

"Q. This fence that you said you installed on the south line, where did it run from?

A. From the back corner of the house, from the southeast corner of the house out to the line and then back to the east side.

Q. Was it right next to the house or was it offset some way?

A. I had a gate where I could go through beside the house and then it went to the south and then back.

Q. Approximately how far was this from the edge of the house to the gate? How wide was your gate?

A. Oh, it was I would say four or five feet. I just made a gate all the way out.

Q. So from the corner of your house the gate came out ap-

Mellberg did not object to either of these acts, though he lived on Lot 30 at the time, and knew about them, and Wineland stated that he never had any dispute relative to the property line with Mellberg. He said that he mowed his lawn over to this fence.

> "Q. And from the fence and gate to the front, to Hilltop Street, where did you mow?
>
> A. Well, I mowed out in line with it."

Wineland testified that the fence had been taken down when he left the property, but part of the posts were still there. He said that he did not obtain permission from Mellberg to run the drain down to the east side of his house, nor did he obtain permission from Mellberg to build the fence—he simply performed these acts, and Mellberg never did say anything about it. He stated he never had any survey made in an effort to locate the true line between the two lots as reflected by the recorded plats. On re-direct examination the following testimony was given:

> "Q. You said there wasn't any verbal agreement, Mr. Wineland. Do you actually remember whether you had any verbal agreement or do you just not know whether you made one or not?
>
> A. Well, I don't know of any. I don't recall any agreement that we made.
>
> Q. But you don't definitely say that there wasn't one, do you?
>
> A. Well, I don't recall any agreement that we made."

---

proximately four or five feet south and then the fence ran out to the south side of the drain, is that correct?
A. Yes, sir."

Osburn, who purchased from Wineland, testified that he did not know where the property lines were located. "Well, there never was anything said about no line no more than they just said approximately out there somewhere." The witness stated that there was no fence of any kind on the south side of the house, and on being asked if, when he moved into the property, he could see where a fence had been, answered, "I don't believe you could no more than it was in a low place. A slope from each house sloped toward it and you could still tell where there was a low place and see where it joined on." Osburn said that he mowed out four or five feet from his house, and that Mellberg never made any objection; nothing was ever said about where the line was located, "I don't know where it was but that was just the understanding between me and him." He also used the drain that Wineland had constructed, but he could not state exactly where the drain was located. The witness testified that Mellberg moved while he (Osburn) was still living on the premises; that Bryson moved into the Mellberg house, but did not object to his manner of mowing. Osburn testified that Bryson had the line surveyed, that the surveyer "put it over there somewhere in my way and I picked it up and throwed it out of the way." He said he told one of the Bryson "kids" that there was no need of "stakes between me and him." Osburn lived on the premises approximately six years before conveying to Dillon. The latter testified that he was claiming over to the drain, approximately five feet. This was admittedly a guess, and at other times, the witness would state, "4 or 5 feet." He said that Bryson started to build a fence about six inches from his house, but never did construct it; however, appellant put out rose bushes on the strip Dillon was claiming. Dillon admitted that at the time he purchased the property, and was looking it over, Bryson asked him if he "found out where the property line was," and he further said that appellant told him that the line was about two and one-half inches from his house.

Bryson testified that when he first moved to the premises he did not know just where the line was located, and he subsequently obtained a surveyor to ascertain that fact. He stated that both he and Osburn mowed the same strip, but they never discussed the matter. Appellant said that he met Dillon when the latter came to look over the Osburn property, and he told this appellee that, according to the survey, the house extended on his (Bryson's) property, but "I'll not cause you any trouble over it." Dillon made no response. Appellant said that he set rose bushes out on the disputed strip, and Dillon complained, stating that he intended to have it surveyed. However, from the record, this was not done. Two surveys were made at the instance of Bryson, one by George Wadley, and the other by Clay Kenward, registered engineer. The Wadley survey caught the southeast corner of the Dillon house, and the Kenward survey came out about one foot to the south, leaving the line about eight inches from the corner of the house. Bryson stated his willingness to accept the second line.

It will be seen from this review of the evidence that there was never any agreed boundary line, i. e., none of the prior owners had ever agreed, or for that matter, even discussed, where the property line was located. In fact, it doesn't even appear that anyone gave thought to the true location of the line until Bryson had the first survey made. The trial court recognized this fact, and held only that a "tacit" agreement had been reached. This holding was based on acquiescence. The complaint does not allege, nor did the court find, that title had been established by adverse possession. In a long line of cases, we have held that, to establish an agreed boundary line, there must be an uncertainty or dispute as to the boundary line, there must be an uncertainty or dispute as to the boundary; that the agreement must be made by adjoining landowners; the boundary line fixed by the agreement must be definite and certain, and finally, the agreement must be followed by possession. *Payne* v. *McBride*, 96 Ark. 168, 131 S. W. 463; *Taylor* v. *Rudy*,

99 Ark. 128, 137 S. W. 574; *Malone* v. *Mobbs,* 102 Ark. 542. 145 S. W. 193, (*on rehearing*) 102 Ark. 545, 146 S. W. 143; *Sherrin* v. *Coffman,* 143 Ark. '8, 219 S. W. 348; *Moeller* v. *Graves,* 236 Ark. 583, 367 S. W. 2d 426. As occasionally happens, cases are found, which, without careful scrutiny, may indicate a departure from this rule. Appellant mainly relies on our case of *Deidrech* v. *Simmons,* 75 Ark. 400, 87 S. W. 649, where these requirements are not specifically mentioned, and it is said that an agreement may be inferred from long continued acquiescence and occupation, thus binding the parties. However, the facts there are not at all in accord with the present facts. In *Deidrech,* Melinda E. Kilpatrick was deeded Lot 4 in Block 74 of Tennehill and Owen's Addition in Pine Bluff by James M. Hudson, who also conveyed Lot 1 to Silas Reynolds. These two parties later conveyed to others, and eventually Deidrech became the owner of Lot 1 and Simmons became the owner of Lot 4. Simmons caused Lot 4 to be surveyed, and his survey reflected that this lot included some of the Deidrech property (which had earlier been owned by Reynolds). Mrs. Kilpatrick, who had originally purchased Lot 4 from Hudson, testified that she built a fence marking the boundary line between the two lots, and never at any time claimed any land north of the fence. Reynolds subsequently built a fence adjoining her fence, and she stated that she never, either before, or after, claimed any part of the land on the Reynolds side of the fence. This line was also observed by the subsequent owners of Lot 4 until the property was conveyed to Simmons. This court held that Mrs. Kilpatrick and Reynolds and subsequent purchasers had tacitly agreed upon the division line.

The opinion reflects, however, that there was uncertainty as to the line, caused by differences in two maps, both being generally accepted as correct, though they differed as to a 12-foot strip between the properties, so it is very evident that there was uncertainty as to the true line. In the next place, the original fence

was constructed by the owner of Lot 4, the result being that she gave up a strip of her property, but she emphatically stated that she never claimed beyond the fence she had herself built.

Here, there is really no uncertainty as to the boundary line (except for the difference of less than a foot in the two Bryson surveys); rather, the owners of the properties apparently never bothered to find out where the line was located. Also, to conform to *Deidrech*, the fence constructed in the present litigation would have had to have been built by Mellberg, who would have been giving up some of his property, rather than by Wineland, who was taking additional footage. Not only that, but in *Deidrech* the fence stood for many years, and the Wineland fence only stood during the period of his particular ownership, which could not have been more than three years.

Appellee also relies on *Seidenstricker* v. *Holtzendorff*, 214 Ark. 644, 217 S. W. 2d 836. The opinion points out that there was uncertainty in the location of the true line, and it was also shown that for more than thirty years, a fence had been recognized as a division fence. The court held that:

"Acquiescence, by owners of adjoining lands, in a boundary line, as shown by a division fence, for more than seven years will ordinarily confirm the boundary line as thus located, even though the fence may not be placed on the true line between the tracts."

It is apparent that adverse possession was one of the factors in this case, and the same is also true of the third case relied upon by appellee, *Vaughn* v. *Chandler*, 237 Ark. 214, 372 S. W. 2d 213. There, too, the case was determined on the basis of adverse possession, the court stating:

"After a careful review of the evidence in this case

we have determined that the 1,295.7 foot strip of land was occupied adversely by the appellee for more than seven (7) years in the belief that the existing fence represented the true boundary.''

In *Sherrin* v. *Coffman,* supra, we said:

''In the present case there is no testimony to show that the parties made any agreement about the boundary line, or that such agreement if made was executed. Mrs. Coffman's testimony only goes to the extent of showing that she had a survey made and that the adjoining proprietor afterwards recognized its correctness and asked permission to move a house situated on the disputed strip. This testimony falls short of showing that the parties made an oral agreement establishing a boundary line which had been in dispute and that the possession of the disputed tract was taken by Mrs. Coffman by virtue of such agreement.''

Summarizing, the evidence in this case reflects that the same description was used in each conveyance all the way from Mellberg to Dillon, and, under this description, the disputed tract belonged to appellants. There was no agreement by any of the owners, nor was any definite line considered as the boundary. In fact, the strongest evidence offered by appellee was that the line was approximately ''4 or 5 feet'' from the southeast corner of the house. While there was testimony by Wineland that he built a fence (and it is not clear to where this fence extended), this mark of a purported boundary was only in existence for less than three years, and was no longer standing when the property was conveyed from Wineland to Osburn. Finally, it does not appear that there was any dispute about the location of the proper boundary until the appellant had the property surveyed.

It follows, from what has been said, that the complaint should have been dismissed, and the court erred

in establishing the line heretofore referred to; the decree is reversed, and the cause remanded to the Greene County Chancery Court, with directions to enter a decree in accordance with this opinion.